# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2022 CA 0971

### STONETRUST COMMERCIAL INSURANCE COMPANY

### VERSUS

### TBT CONTRACTING, INC. OF LA, ET AL

Judgment Rendered: **APR 1 4 2023**

\* \* \* \* \* \*

On Appeal from the Seventeenth Judicial District Court
In and for the Parish of Lafourche
State of Louisiana
Docket No. 140821
Honorable Marla M. Abel, Judge Presiding

\* \* \* \* \* \*

| | |
|---|---|
| Colin P. O'Rourke<br>Jeremy D. Carter<br>Phillip E. Foco<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellant<br>Stonetrust Commercial<br>Insurance Company |
| Travis L. Bourgeois<br>Sidney W. Degan, III<br>Jena W. Smith<br>New Orleans, Louisiana | Counsel for Defendant/Appellee<br>TBT Contracting, Inc. of LA |
| Kaitlyn E. Bourg<br>Mallory F. Maddocks<br>Michael G. Gee<br>Michelle D. Brooks<br>Davis R. Peltier<br>Thibodaux, Louisiana | Counsel for Defendants/Appellees<br>Joshua Luft and Melissa Luft |

\* \* \* \* \* \*

**BEFORE: McCLENDON, HOLDRIDGE, AND GREENE, JJ.**

Holdridge J. concur v/Result

**McCLENDON, J.**

Plaintiff-appellant challenges the trial court's grant of summary judgment, which dismissed plaintiff's claims against defendant-appellee with prejudice. For the reasons that follow, we affirm.

### FACTS AND PROCEDURAL HISTORY

The facts giving rise to this lawsuit are largely undisputed. Homeowners Joshua and Melinda Luft engaged TBT Contracting, Inc. (TBT), a general contractor, to perform a home renovation project. TBT engaged Naquin Electrical, Inc. (Naquin) to perform the electrical work. On June 11, 2019, Gary Andras was performing electrical work in the Lufts' home, in the course and scope of his employment with Naquin, when he fell through an attic access hole cut in the ceiling of the home and sustained injuries. Stonetrust Commercial Insurance Company (Stonetrust), Naquin's workers' compensation insurer, voluntarily paid workers' compensation benefits to and on behalf of Mr. Andras following the accident.

On June 9, 2020, Stonetrust filed a petition for subrogation against the Lufts and TBT, together with their respective liability insurers.[1] Stonetrust sought reimbursement for the workers' compensation benefits made to and on behalf of Mr. Andras as a result of the accident, together with interest, penalties, attorney fees, and all costs of the proceedings.

Regarding TBT, Stonetrust argued TBT created a hazard by cutting the attic access hole in the rafters and ceiling, concealed the hazard by covering it with Styrofoam or other similar material, and failed to warn of the hazard, ultimately resulting in Mr. Andras's fall and resulting injuries. Stonetrust argued that the Lufts maintained operational control over the project and knew or should have known of the hazard that caused Mr. Andras's injuries.

---

[1] Stonetrust named "ABC Insurance Company" as TBT's liability insurer and "XYZ Insurance Company" as the Lufts' liability insurer. The Lufts alleged in their motion for summary judgment that their homeowner's policy, issued by Louisiana Farm Bureau Casualty Insurance Company, did not provide coverage for Mr. Andras's accident because the Farm Bureau policy explicitly excluded payments to any person eligible to receive benefits under workers' compensation law.

2

On April 27, 2021, the Lufts filed a motion for summary judgment seeking dismissal, with prejudice, of Stonetrust's claims against them. The Lufts argued that Stonetrust could not satisfy its burden of proof and establish liability on their part. The Lufts first asserted they were not vicariously liable for any action or negligence attributed to TBT that caused Mr. Andras's injuries, because TBT was an independent contractor. The Lufts next contended the record was devoid of evidence demonstrating the existence of a genuine issue of material fact regarding whether the Lufts were the proximate or legal cause of the accident at issue. The Lufts submitted the following documents in support of their motion for summary judgment: an affidavit executed by Joshua and Melinda Luft, with TBT's proposal to the Lufts attached as an exhibit thereto; an affidavit executed by Louisiana Farm Bureau Insurance Company (Farm Bureau) District Claims manager, David Reed, together with the Farm Bureau homeowner's insurance policy issued to the Lufts; and TBT's responses to Stonetrust's first set of interrogatories.

Stonetrust opposed the Lufts' motion for summary judgment. In support of its opposition, Stonetrust offered the deposition of TBT's on-site supervisor for the renovation of the Lufts' home, Brian LaRousse, the deposition of Mr. Luft, the deposition of Mrs. Luft, and the affidavit of T. Benton Thompson.

The Lufts' motion for summary judgment was heard on February 18, 2022. For reasons stated in open court, the trial court granted summary judgment on behalf of the Lufts, and dismissed Stonetrust's claims against the Lufts with prejudice. A written judgment confirming the trial court's oral ruling was executed on March 9, 2022. Stonetrust appealed,[2] arguing that the trial court erred in finding that there were no genuine issues of material fact that the Lufts were not vicariously liable or directly liable for Mr. Andras's injuries, and in granting the Lufts' motion for summary judgment on those grounds.

---

[2] We note that TBT filed a motion for summary judgment seeking dismissal of Stonetrust's claims against TBT, which was also heard on February 18, 2022. Following a hearing, the trial court granted summary judgment dismissing Stonetrust's claims against TBT. Stonetrust filed an appeal, which is presently pending before this Court as 2022 CA 0972.

3

## SUMMARY JUDGMENT

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to determine whether there is a genuine need for trial. **Louisiana Workers' Compensation Corporation v. B, B & C Associates, LLC**, 2017-1342 (La.App. 1 Cir. 4/9/18), 249 So.3d 18, 22. After an opportunity for adequate discovery, a motion for summary judgment shall be granted if the motion, memorandum, and supporting documents show there is no genuine issue of material fact and the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(A)(3). In determining whether summary judgment is appropriate, appellate courts review evidence *de novo* under the same criteria that governs the trial court's determination of whether summary judgment is appropriate. **In re Succession of Beard**, 2013-1717 (La.App. 1 Cir. 6/6/14), 147 So.3d 753, 759-60.

The initial burden of proof is on the party filing the motion for summary judgment. LSA-C.C.P. art. 966(D)(1). The mover may meet this burden by filing supporting documentary evidence consisting of pleadings, memoranda, affidavits, depositions, answers to interrogatories, certified medical records, written stipulations, and admissions with the motion for summary judgment. LSA-C.C.P. art. 966(A)(4). The mover's supporting documentary evidence must prove the essential facts necessary to carry its burden. Thus, in deciding a motion for summary judgment, we must first determine whether the supporting documents presented by the mover are sufficient to resolve all material fact issues. **Seal v. Louisiana Farm Bureau Mutual Insurance Co.**, 2021-0988 (La.App. 1 Cir. 3/16/22), 341 So.3d 659, 662.

Nevertheless, if the mover will not bear the burden of proof at trial on the issue that is before the court on the motion, the mover's burden does not require that all essential elements of the adverse party's claim, action, or defense be negated. Rather, the mover must point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. LSA-C.C.P. art. 966(D)(1). Once the motion for summary judgment has been properly supported by the moving party, and the mover has shown that the motion for summary judgment should be granted, the burden then shifts to the non-moving party to produce factual

4

support, through the use of proper documentary evidence attached to his or her opposition, sufficient to establish that he or she will be able to satisfy his or her evidentiary burden of proof at trial, that is, the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. See LSA-C.C.P. art. 966(D)(1); **Trichell v. McClure**, 2021-1240 (La.App. 1 Cir. 4/8/22), 341 So.3d 856, 860. If the non-moving party fails to produce factual support in opposition sufficient to establish that he or she will be able to satisfy his or her evidentiary burden of proof at trial, LSA-C.C.P. art. 966(D)(1) mandates the motion for summary judgment be granted. **Id.**

## VICARIOUS LIABILITY

We will first address Stonetrust's argument that the trial court erred in finding the Lufts were not vicariously liable for Mr. Andras's injuries. Under Louisiana law, an employer is vicariously liable for the negligence of its employees that occurs within the course and scope of the employees' employment. See LSA-C.C. art. 2320; **Trichell**, 341 So.3d at 860. In contrast, a principal is generally not liable for the torts of independent contractors performing their contractual duties, although two well-established exceptions to this general rule exist: when the injury results from an ultrahazardous activity, and when the principal reserves the right to supervise or control the work of the contractor. See **Trichell**, 341 So.3d at 860; **Stovall v. Shell Oil Co.**, 577 So.2d 732, 742 (La.App. 1 Cir.), writ denied, 582 So.2d 1309 (La. 1991). In determining whether an employment or independent contractor relationship exists, the most important element to be considered is the right of control and supervision over an individual. **Bouquet v. Williams**, 2016-0134 (La.App. 1 Cir. 10/28/16), 206 So.3d 232, 237, writ denied, 2016-2077 (La. 1/9/17), 214 So.3d 870, and writ denied, 2016-2082 (La. 1/9/17), 214 So.3d 871. The burden of proof lies with the party seeking to establish the employer-employee relationship. **Trichell**, 341 So.3d at 861.

The distinction between an employment or independent contractor relationship is a factual determination that must be decided on a case-by-case basis. **Fonseca v. City Air of Louisiana, LLC**, 2015-1848 (La.App. 1 Cir. 6/3/16), 196 So.3d 82, 87. In determining whether an independent contractor relationship exists, courts consider whether: (1) a valid contract exists between the parties; (2) the work is of an independent

5

nature; (3) the contract allows for the work to be done according to the contractor's own methods, without being subject to control and direction, except as to the result of the services to be rendered; (4) a specific price for the overall undertaking is agreed upon; and (5) the duration of the work is for a specific time and not subject to termination at the will of either party (collectively sometimes, "the **Hickman** factors"). See **Hickman v. Southern Pacific Transport Company**, 262 La. 102, 117, 262 So.2d 385, 390-391 (1972); **Fonseca**, 196 So.3d at 87. In other words, to determine whether someone is an independent contractor, the court must look at the degree of control over the work. **Id.**

As the party moving for summary judgment, the Lufts bore the burden of proof on the motion for summary judgment. See LSA-C.C.P. art. 966(D)(1). However, because Stonetrust would bear the burden of proof at trial as the party seeking to establish the employer-employee relationship, the Lufts were not required to negate all essential elements of Stonetrust's claim; rather, the Lufts were required to point out to the court that there is an absence of factual support for one or more elements essential to Stonetrust's claim. See **Trichell**, 341 So.3d at 861; LSA-C.C.P. art. 966(D)(1). Thus, the propriety of summary judgment in favor of the Lufts hinges on whether the Lufts successfully pointed out the absence of factual evidence that an employment relationship existed between TBT and the Lufts, and if so, whether Stonetrust thereafter came forward with sufficient factual support to show a genuine issue of material fact remained. **Liberty Mutual Fire Insurance Company v. Harris**, 2022-0429 (La.App. 1 Cir. 11/4/22), 355 So.3d 628, writ denied, 2022-01747 (La. 2/7/23), 354 So.3d 671.

As noted above, the Lufts offered their own affidavit, together with TBT's proposal, in support of their motion for summary judgment. The Lufts attested that they entered into a contract with TBT for a specific job to be performed for the specific price of $581,900.00, as evidenced by the proposal.[3] The proposal was dated February 21, 2019, printed on TBT letterhead, and submitted by TBT president T. Benton Thompson. The proposal further bore the signature of Mr. Luft with the date of March 13, 2019, under

---

[3] The Lufts' affidavit stated the agreed-upon price was $581,000.00. The bid proposal identified the agreed-upon budget as $581,900.00. Presumably, the difference was due to a clerical error. We rely on the amount reflected in the bid proposal herein.

an "APPROVED:" stamp. The proposal explicitly stated that TBT would "provide all material, equipment, labor[,] and supervision to construct the additions and renovations [to the Lufts' home]." The Lufts' affidavit asserted that they "did not have any control with who TBT employed or how the work was to be performed for the renovation," and "did not have any control as to the work Naquin Electrical was performing in the renovation."[4] Rather, the Lufts maintained that TBT had full discretion, control, and supervision over Naquin. With respect to the attic access hole specifically, the Lufts attested that TBT had cut a hole in the attic for a door and that the employee(s) of TBT had not notified them of the hole prior to the accident.

The Lufts also offered the affidavit of David Reed, the Farm Bureau District Claims Manager, together with the homeowner's insurance policy Farm Bureau issued to the Lufts, in support of their motion for summary judgment. While the trial court declined to consider several paragraphs of Mr. Reed's affidavit,[5] the portions of the affidavit which were admitted verified the attached Farm Bureau homeowner's insurance policy as a true and correct copy of the policy issued to the Lufts.

Finally, the Lufts submitted TBT's responses to discovery propounded by the Lufts. TBT's responses to interrogatories asserted that TBT was contracted to perform renovation and addition of the Lufts' home; that in doing so, TBT performed general contracting, supervision, and some carpentry work; and that while Mr. Larousse was TBT's on-site supervisor for the renovation of the Lufts' home, each subcontractor onsite was responsible for following all applicable industry safety standards.

Having conducted a thorough *de novo* review of the evidence the Lufts offered in support of their motion for summary judgment, we find that the Lufts successfully pointed out the absence of factual support for Stonetrust's claim that an employment relationship

---

[4] The Lufts attested that the only exceptions to this general statement involved a painter and a separate contractor for the pool, which were not related to the accident. Stonetrust does not dispute that the painter and the contractor for the pool were not involved in Mr. Andras's accident.

[5] Stonetrust objected to paragraphs 4 through 10 of Mr. Reed's affidavit in its memorandum in opposition to the summary judgment, on the basis that Mr. Reed "[was]not asserting facts known pursuant to his personal knowledge, and alternatively, that he [was] asserting facts that pertain to an ultimate issue and/or conclusion of law." During the February 18, 2022 hearing of the Lufts' summary judgment, the trial court ruled that it would not consider paragraphs 4 through 8 of Mr. Reed's affidavit, because they contained hearsay and therefore were not based on information personally known to Mr. Reed. The trial court also ruled that it would not consider paragraphs 9 and 10, which contained legal conclusions. This ruling has not been challenged on appeal.

existed between TBT and the Lufts. Contradicting Stonetrust's assertion, the Lufts presented evidence that the relationship between TBT and the Lufts satisfied the **Hickman** factors. Specifically, the Lufts presented evidence that a valid contract existed between the Lufts and TBT, the purpose of which was a specific undertaking of a specific duration, to be performed by TBT independently, according to TBT's methods, for a specific price. Further, the Lufts presented evidence that the degree of control they maintained over the work was restricted to the result to be rendered. Consequently, the Lufts offered sufficient summary judgment evidence to establish that TBT was the general contractor hired by the Lufts to perform the work on the renovation of the Lufts' home and was not an employee of the Lufts. The burden thereafter shifted to Stonetrust to come forward with sufficient factual support to show a genuine issue of material fact remained. See **Liberty Mutual Fire Insurance Company**, 355 So.3d at 633.

In opposing the Luft's motion for summary judgment, Stonetrust argued that genuine issues of material fact remained precluding summary judgment. Specifically, Stonetrust argued that genuine issues of material fact remained because the bid proposal did not describe the scope of the work TBT was contracted to perform or the scope of control the Lufts retained over the work. Stonetrust asserted that the Lufts lived in a rental house across the street during the renovation and stayed in close contact with TBT's supervising contractor, Mr. LaRousse, who would update the Lufts and walk through the home with Mr. Luft. Stonetrust maintained that during the walk throughs, Mr. Luft would give suggestions and/or approval over work to be performed, resulting in substantial additions and alterations to the work originally contemplated, including the creation of the attic access hole through which Mr. Andras fell. Stonetrust further contended that Mr. Luft's change orders also affected the originally agreed upon price. Thus, Stonetrust maintained that the evidence demonstrated that the Lufts maintained control over TBT's work and were vicariously liable for Mr. Andras's injuries.

In support of Stonetrust's opposition, it offered the deposition of Mr. LaRousse. Mr. LaRousse, a licensed renovator and contractor, testified that he was employed as a superintendent for TBT both at the time of Mr. Andras's accident and at the time of his deposition. In his capacity as a superintendent for TBT, Mr. LaRousse would "go on the

8

job for TBT" and coordinate the different subcontractors and materials. Mr. LaRousse confirmed that, for the work originally contemplated as well as for change orders, the Lufts did not direct or select the subcontractors or materials. Rather, TBT was responsible for the work and managing the subcontractors. Generally, Mr. LaRousse spoke to Mr. Luft several times throughout the day during and regarding the renovation. He testified that Mr. Luft would speak to the subcontractors when he walked through the house, but did not discuss anything major with them. Mr. LaRousse recalled marking on the wall to indicate to Naquin the location where Mr. Luft wanted a TV hung.

Regarding the attic access hole, Mr. LaRousse testified that prior to the renovation, attic access was through a small hole in a bathroom, but work performed during the renovation prevented use of the original attic access. Thus, the Lufts requested alternate attic access, though Mr. LaRousse did not recall when the request was made. TBT then contacted F and G Framing,[6] subcontracted the work to F and G, and F and G performed the work to create the attic access hole. Mr. LaRousse did not recall when the hole was cut. However, he stated that the attic access hole was created to make it easier for "everybody to get up there," including Mr. Luft, the air conditioning workers, and the plumbers.

On the day of Mr. Andras's accident, Mr. LaRousse "assisted" Naquin by moving certain items to make it easier for Naquin to perform its electrical work. However, Mr. LaRousse clearly stated that he was not involved with any of the electrical work itself, did not enter the attic, did not direct anyone else to enter the attic, and did not tell anyone else "what to do on their job" generally. Mr. LaRousse had left the Lufts' home and was not present at the time of Mr. Andras's fall. When Mr. LaRousse learned of the fall, he returned to the Lufts' home, confirmed Mr. Andras was receiving medical attention, and called TBT's office to notify TBT of the accident.

Stonetrust also offered the depositions of Mr. and Mrs. Luft in support of its opposition. Mr. Luft testified that he and his wife worked with a designer, Roth Interiors, to develop the renovation project. They then hired TBT to act as the contractor for the

---

[6] We note that, while Mr. Larousse's deposition referred to F & G Framing, Stonetrust amended its petition to name "F & G Construction LLC" as a defendant.

renovation. Mr. Luft's contact with TBT, T. Benton Thompson, proposed the timeline and price for the renovation, which Mr. Luft then agreed to. In addition to the single page of the bid proposal which was submitted in support of and in opposition to the Lufts' motion for summary judgment, the Lufts' contract with TBT included a "multipage budget" that contained a breakdown of the $581,900 estimated price. The Lufts relied upon TBT for scheduling, selecting subcontractors, and ensuring the renovation was proceeding in accordance with the plans submitted by the designer. Mr. Luft testified that he did not supply the tools or materials (with the exception of paint); TBT did. While Mr. Luft had a separate company plan a pool, and contacted someone to finish the sheetrock after TBT's subcontractor quit, he made clear that TBT managed everything else. Mr. Luft believed he and his family moved into the home across the street after signing the bid proposal. He was confident that his family did not return to the home until after the renovation was completed.

Mr. Luft testified that when he was in town, he saw Mr. LaRousse "multiple times a week" during the renovation. Consistent with Mr. LaRousse's testimony, Mr. Luft stated that his interaction with the workers was primarily "pleasantries, saying hello, seeing how things were going." When asked whether he checked "to make sure the workers were remodeling the house according to the plans that you had submitted from [the designer to TBT]," he responded, "I'd mainly rely on [Mr. LaRousse] for that." Mr. Luft also spoke with Mr. Thompson and TBT's office manager about the renovation on occasion.

During Mr. Luft's deposition, Stonetrust presented text messages Mr. Luft purportedly sent to a representative of TBT, believed to be Mr. Benton, regarding the renovation. The texts contained directives regarding when and how work was to be performed, such as "He will pipe into the slab area and we should try and pour later on Monday afternoon if possible or Tuesday morning so that can be finished and we can get the ACs in." Mr. Luft testified that he did not recall sending those texts and believed they were sent to him by TBT, stating, "I think you got the messages mixed around." The Lufts objected to the production of the texts, pointing out that Mr. Luft did not recall the messages, there was no date on the messages, and there was no identification regarding who the messages were to or from other than "Josh Luft."

10

Mr. Luft was also asked to identify a letter from Naquin to TBT regarding change orders made. Mr. Luft testified that Mr. LaRousse suggested additional changes, including where to hang a TV, and he "guess[ed]" Mr. LaRousse then coordinated the change orders with Naquin's crew. Some of the changes were adjustments to the original scope of the work, while others were in addition to the original scope of the work. Mr. Luft testified that TBT sent him invoices, which he paid to TBT directly.

Mr. Luft's deposition testimony did not address the attic access hole or the accident in detail. His limited testimony established that he was not in the attic when the accident occurred, nor did he witness the accident. Mr. Luft also testified that he couldn't remember the last time he was in the attic prior to the accident, but it was "Probably taking Christmas decorations out the prior year." He was made aware of the accident, and asked afterwards if Mr. Andras was okay, but didn't hear more until he was served with the lawsuit.

Stonetrust offered the deposition of Mrs. Luft as well. Mrs. Luft testified that she was present during Mr. Luft's deposition, did not disagree with any of his testimony, and would defer to his testimony regarding the renovation, the accident, and oversight of the renovation. She did not enter the home during the renovation. Mr. Luft handled the interactions with TBT. Mrs. Luft worked only with the designer.

Stonetrust offered the affidavit of Mr. Thompson, the President of TBT. Mr. Thompson attested he had personal knowledge that TBT entered into a general contract with the Lufts to serve as the general contractor for the renovation of their residence. In order to complete the renovations and additions requested by the Lufts, Mr. Thompson entered into a subcontract whereby Naquin would provide the electrical equipment, material, and labor for certain electrical work. Mr. Thompson verified Naquin's invoices, copies of which were attached as exhibits to his affidavit, and stated that Naquin invoiced TBT directly for all work performed on the Lufts' residence. Mr. Thompson further attested that he "facilitated most, if not all, communications regarding the original electrical renovation and additions, as well as any subsequent changes thereof, between the Lufts and Naquin." The Naquin invoices reflected that Naquin agreed to provide the labor,

11

material, equipment, and supervision for particular itemized work on the Lufts' renovation.

Having thoroughly reviewed the parties' evidentiary submissions in their entirety, we find that the trial court properly granted the Lufts' motion for summary judgment on the issue of vicarious liability. Once the Lufts established that TBT was an independent contractor, the general rule that a principal is generally not liable for the torts of independent contractors performing their contractual duties applied. This shifted the burden to Stonetrust to prove that one of the two well-established exceptions to this general rule exist – that is, that Mr. Andras's injury either resulted from an ultrahazardous activity, or the Lufts reserved the right to supervise or control the work of TBT. See **Trichell**, 341 So.3d at 860; **Stovall**, 577 So.2d at 742. In this matter, there was no dispute that the work being performed was not ultrahazardous, and there was no evidence supporting Stonetrust's assertion that the Lufts maintained operational control over the creation of the hole. To the contrary, the evidence presented by the Lufts, as well as the evidence presented by Stonetrust, demonstrated that the Lufts' control over the work was restricted to the result to be rendered, as opposed to operational control. Thus, the case *sub judice* does not fall under either of the exceptions to the general rule that a principal is not liable for the torts of an independent contractor. See **Stovall**, 577 So.2d at 742. Further, while we note that some issues of disputed fact may remain, such as who cut the attic access hole and when, and the scope of the work originally contracted for, these issues are not material to the issue of whether the Lufts can be held vicariously liable for Mr. Andras's injuries. Though the change orders altered the work done, they did not alter the nature of the relationship between the Lufts and TBT. There was no evidence that the Lufts exercised control over anything other than the result. The same is true with regard to the change orders requested. This assignment of error lacks merit.

## DIRECT LIABILITY

We will next address Stonetrust's argument that the trial court erred in finding the Lufts were not directly liable for Mr. Andras's injuries. The legal basis for liability of a homeowner for injuries caused by a defect in the home is typically premised on LSA-C.C.

12

arts. 2317, 2317.1, and 2322.[7] **Sasser v. Wintz**, 2011-2022 (La.App. 1 Cir. 9/4/12), 102 So.3d 842, 846. However, generally, the owner of a building under construction or renovation does not have custody for purposes of liability based on the foregoing civil code articles. An exception to that rule occurs when the owner exercises operational control over the contractor's methods of operation or gives express or implied authorization to unsafe practices. **Sasser**, 102 So.3d at 846. Thus, in order to prevail on its claims against the Lufts, Stonetrust would bear the burden of having to prove that the Lufts exercised such operational control over TBT with respect to the creation of the attic access hole. See **Sasser**, 102 So.3d at 846.

On this issue, we have already determined that the Lufts presented undisputed evidence that they did not exercise operational control over the work performed. In like manner, based both on our finding that the Lufts generally did not exercise operational control over the work performed and on the absence of any evidence that the Lufts gave express or implied authorization for unsafe practices, we find that the trial court properly granted the Lufts' motion for summary judgment on the issue of direct liability. From our de novo review of the evidence presented in support of and in opposition to the motion for summary judgment, we find that this assignment of error lacks merit. The trial court's judgment dismissing Stonetrust's claims that the Lufts were liable for Mr. Andras's injuries was proper.

---

[7] Louisiana Civil Code article 2317, "Acts of others and of things in custody," provides, "We are responsible, not only for the damage occasioned by our own act, but for ... the things which we have in our custody. This, however, is to be understood with the following modifications."

Louisiana Civil Code article 2317.1, "Damage caused by ruin, vice, or defect in things," provides:

The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

Louisiana Civil Code article 2322, "Damage caused by ruin of building," provides:

The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case.

## CONCLUSION

For the foregoing reasons, the March 9, 2022 judgment of the trial court, granting summary judgment in favor of Joshua and Melissa Luft and dismissing the claims asserted by Stonetrust Commercial Insurance Company against the Lufts, with prejudice, is affirmed. Costs of this appeal are assessed against Stonetrust Commercial Insurance Company.

**AFFIRMED.**